Filed 10/25/22  In re E.G. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re E.G., a Person Coming Under the Juvenile Court Law. | B315855 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP08012B) |
| Plaintiff and Respondent, | |
| v. | |
| KAREN M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Timothy M. O'Crowley, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Karen M. (Mother) challenges the juvenile court's order terminating her parental rights to her daughter E.G. She contends the court wrongly refused her offer of proof for a contested permanent planning hearing, failed to read and consider the report and assessment provided for that hearing, and did not conduct a correct beneficial parent-child relationship analysis as set out in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). She urges us to reverse the order terminating parental rights and remand the matter for a new hearing under Welfare and Institutions Code section 366.26.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has three children: A.L., E.G., and L.G. E.G. and L.G. have the same father; A.L. is their half-sibling. We discuss A.L. and L.G. when relevant, but only the orders involving E.G. are at issue in this appeal.

I.    Previous Dependency Proceedings

A.L. was born in 2006. In 2008, the Department of Children and Family Services (DCFS) substantiated allegations that he was exposed to drug use and was living in unsafe conditions in an apartment where bleach, paint, scissors, a knife, and methamphetamines were within his reach. A.L. was removed from Mother's custody for one month before being released back to her over DCFS's objection. Mother entered into a voluntary family maintenance contract and the petition was dismissed.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

E.G. was born in August 2013. In July 2014, police found methamphetamine in the family's home and a digital scale in E.G.'s crib. E.G.'s father A.G. (Father) and Mother were arrested and prosecuted. The family entered into another voluntary family maintenance contract in September 2014, but in March 2015, Mother tested positive for methamphetamine when L.G. was born. Mother admitted using drugs while pregnant.

The children were detained, and DCFS filed section 300 petitions in March 2015. As to E.G., the court sustained two allegations under section 300, subdivision (b)(1). First, the court sustained the allegation that Mother's ongoing drug abuse interfered with her care and supervision of E.G., and that Father knew about her drug abuse but failed to protect E.G. Second, the court found the parents had created a detrimental and endangering home environment for E.G. in that drugs and drug paraphernalia were found in the home and within her reach, and that the home environment created by the parents threatened her physical health and safety. Additional allegations were sustained as to A.L. and L.G.

The children were placed with E.G. and L.G.'s paternal grandparents from March 2015 until they reunified with Mother in February 2018. The court terminated juvenile court jurisdiction in April 2019 with an order giving Mother legal and physical custody of the children.

II.    Commencement of Instant Dependency Proceedings

On December 11, 2019, DCFS received a report from a person that four-year-old L.G. appeared malnourished and physically abused. Police responding to the referral found she had visible marks and bruises. L.G. told the police Mother hit her and tied her up. She said Mother tied her with tape, causing

3

wounds to her legs and arms.  L.G. appeared "in fear and frightened" when speaking about Mother.

E.G., age six, told the police she had seen Mother hit L.G. and tie her up for hours.  A.L., age 13, confirmed to the police that Mother tied L.G. up, but he was hesitant and did not want to provide information.  It seemed to the police that A.L. "was trying to defend his mom and would not articulate the events that took place."

The maternal aunt told the police that when the children visited her that day, she noticed L.G. was thin and frail and ate in a desperate manner, as though she had not been fed for days.  She "did not associate well with her siblings."  When the maternal aunt prepared to bathe L.G., she discovered open wounds on L.G.'s legs, contusions over her arms, back, legs, and forehead, and a laceration on her wrist from being tied up.  L.G.'s bones protruded from her body as if she were not being fed.

L.G. was taken to the hospital, where it was discovered she had multiple scabs and abrasions to her lower legs; one lesion appeared similar to a burn mark.  She had wounds on her left wrist and significant bruising on the back of one ear.  L.G. had a high fever and high heart rate; she was dehydrated, extremely malnourished, and anemic; and she was diagnosed as failing to thrive.  While hospitalized, L.G. was observed to be "in starvation mode," eating a lot and not knowing when to stop.  She was diagnosed with "refeeding syndrome," a metabolic disturbance that occurs when food is reinstituted to people who have been starved, severely malnourished, or metabolically stressed due to severe illness.  L.G. was highly anxious.  She was unkempt and dirty.  Although initially excited about a shower, she cried throughout it and would not explain why.

L.G. told hospital staff Mother hit her with a belt, tied her up with tape, and did not feed her. When interviewed by DCFS, L.G. denied feeling safe at home and said she was scared of Mother. L.G. reported Mother "tapes both feet" and her siblings had seen it. When asked about her other marks and bruises, L.G. put her head down and refused to provide information. She said Mother made her feel "sad." L.G. later told a nurse she was afraid of her parents, her brother, and her sister.

L.G. did not speak during a forensic medical examination but nodded yes when asked if she had been taped at the wrists and ankles. The examiner reported L.G. jumped when she was touched. She had injuries in different stages of healing on numerous parts of her body. She probably had hair loss; there was a scar on her face; and she had red and purple marks on both sides of her ear. When asked if Mother fed her, L.G. shook her head no. Physical abuse was highly suspected.

Multiple family members and Mother's friend told DCFS Mother disliked L.G. and singled her out for harsh treatment. The maternal aunt said Mother spoke harshly to L.G. and called her "a little bitch" who "eats everything." Mother told E.G. and L.G.'s paternal aunt she could have L.G.

According to family members, A.L. was Mother's favorite child. Father was concerned that Mother lacked patience with E.G. and L.G. and punished them more than A.L. Mother spanked E.G. and L.G.'s bottoms and legs and pulled their hair. DCFS learned from E.G. and L.G.'s paternal aunt that A.L. had told her Mother said L.G. was "the worst kid and she deserves it because she is always breaking things, fighting, and stealing food." The maternal aunt had heard A.L. tell L.G. she was eating too much.

The maternal aunt reported to DCFS that L.G. was required to ask to use the bathroom and sometimes urinated and defecated on herself. If L.G. did not ask for food Mother would not feed her. L.G. told the maternal aunt Mother taped her feet together, and E.G. confirmed it had happened. L.G. had told the maternal aunt she did not want to go home with Mother.

DCFS interviewed A.L. and E.G., both of whom said they felt safe living with Mother, were fed regularly, took regular showers, and slept well at night. Both children were clean and had no visible marks or bruises. A.L. denied emotional, physical, and sexual abuse, domestic violence, and exposure to drugs or alcohol. He said L.G. was given meals throughout the day and loved to eat. Both children attributed L.G.'s marks and bruises to L.G. falling while wearing her shoes on the wrong feet; A.L. called her "clumsy." E.G. also said L.G. had marks because she picked at scabs. A.L. said the dog hurt L.G. when it got on top of her, but E.G. denied the dog got on top of L.G. DCFS concluded A.L. and E.G. lacked credibility and expressed concern that Mother had persuaded them to recant their prior statements.

Mother told DCFS she treated her three children the same way. She denied abusing, physically disciplining, or using derogatory language to them. She denied taping any part of L.G.'s body and said L.G. had fallen and hurt her ankles when the dog pushed her on the stairs. The prior month, L.G. had bruised her back when she fell against a fence. Mother denied L.G. had bruises or marks other than those on her back, ankles, and right wrist. She said L.G. had birthmarks and that her skin peeled because she picked at it. Mother attributed L.G.'s thinness to a past case of pneumonia. She reported L.G. ate a lot and had eaten "six regular sliced pizzas in one sitting."

6

The children were detained, and DCFS filed a dependency petition alleging the children came within the jurisdiction of the juvenile court under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), (e) (severe physical abuse of a child under age five); (j) (abuse of sibling). L.G. was initially placed with the maternal aunt, while E.G. and A.L. were placed in foster care.

DCFS spoke with A.L. and E.G. on December 15, 2019. A.L. again attributed L.G.'s marks and bruises to her falling or being pushed by the dog. He denied Mother taped or tied L.G. at the ankles and claimed L.G. was lying so she could return to her grandparents. A.L. said Mother fed L.G. "all the time" and L.G. would sneak into the kitchen for more food. E.G. also denied that Mother taped or wrapped anything around L.G.'s feet, and she said Mother did not hurt L.G. DCFS considered A.L. and E.G.'s statements not credible.

The court removed E.G. from her parents at the detention hearing in December 2019. Mother was granted monitored visitation with E.G. a minimum of three times per week for two hours per visit.

III.  Investigation and Report for Initial Jurisdictional Hearing Date

The jurisdictional hearing was set for February 2020. When DCFS interviewed A.L. before the hearing, he said L.G. had been scratched on the ear when they were playing outside several months earlier. A.L. claimed he was with her when it happened, but he did not know if she fell or was scratched by the dog. A.L. blamed L.G. for her injuries. He said L.G. failed to appreciate that their dog was "hyper" and she ran around with a ball, prompting the dog to jump on her and sometimes scratch

7

her. He stated, " 'Another bad habit of [L.G.'s] is that she likes putting on her shoes backwards,[] for her, that's normal, that's how she walks in them. When she puts them on regular, she falls down a lot, so she is always tripping and runs around a lot.' " A.L. denied seeing L.G. tied or taped up, and when asked if L.G. had ever told him that happened, he said, " 'I never knew that. She never told me.' " He denied any of the children were ever hit. A.L. said "we" would feed L.G. a lot " 'but it seems like she never got full. She just kept eating and eating. She would never get full. Sometimes she would sneak food from the kitchen, but we would feed her every day. We never understood why she would eat so much. She always ate and she was always skinny. She would eat all the time, I would be there when she ate. We ate three times a day, and sometimes she would eat extra.' "

E.G. said Mother did not hit them and denied ever seeing L.G. with her hands or legs taped or tied together. She also denied that L.G. had ever disclosed having been taped up. E.G. said the marks on L.G.'s body were from the dog, who bit people and tackled L.G. to the floor. According to E.G., L.G. had once been hurt when the dog "hit his paw on her leg," but that was the only time the dog hurt L.G. by tackling her. E.G. said L.G. "eats good" and did not miss meals—but if she did miss any meals, "it was because she didn't feel like eating it. She eats a lot. But, we all eat the same amount like her, so we all eat a lot."

During a January 2020 forensic assessment, L.G. said, "My mommy didn't feed me nothing and I got these [indicating healed marks on the bottom of her left leg, above her ankle, and on her left arm], my mom did these . . . it made me sad." L.G. also said that the family dog was big but not mean. She reported that the

dog had once pushed her to the ground but she was not hurt.  The dog had once scratched her ear, and it bled a little.

L.G. made disclosures about Mother during a January 2020 examination.  L.G. said she had been tied up, kicked, put in a closet, threatened with having her hand burned on the stove, and placed in a cold dark shower.  She had slept in the dog bed and in the car.  L.G. had both healed marks and open wounds that were healing.  L.G. said the marks on her ears were caused by tape.  She pointed to her neck, indicating Mother had put tape on and around her neck.  She identified a number of healed wounds that had been caused by tape.

E.G. and L.G.'s paternal grandmother, with whom they had been placed from 2015 to 2018, said Mother had allowed her to see the children only twice after they reunified with Mother in 2018.  The first time the paternal grandmother saw them was soon after reunification; they looked unhappy but physically fine.  The second time she saw the children was when she went to Mother's home to ask to see the children.  Mother refused, but E.G. spotted the paternal grandmother and cried, saying, "Why can't I see my mom [meaning the paternal grandmother]?"  Mother "didn't care, she just closed the door."

The paternal grandmother recalled Mother telephoning her while incarcerated to announce she was pregnant with L.G.  Mother called it "bad news," and she did not want the baby.

E.G. and L.G.'s paternal grandfather said that when he saw the children for the first time after they were reunified with Mother, L.G. ate all the food he brought "with no control."  L.G. had been thin; E.G. looked "okay."  The second time he saw the children, E.G. told him A.L. hit L.G. with a belt, and L.G. had small marks on her ear that looked like lines.

E.G. and L.G.'s paternal grandfather said of the two children, "[T]hey need us. We raised them for three years to the day they walked away from us to go to the mom. This is their house. They were born here. [L.G.] was taken away from her mom after she was born and brought here to us. They . . . feel that this is their house. They ask for their stuff and they ask to come back home to their toys . . . to their room. They call my wife Mommy and I am Poppy. We were in the adoption stage with them in 2018. The kids were here for 3-1/2 years." E.G and L.G. wanted to live with their grandparents; E.G. had said, " 'I want to talk to the social worker, I want to go home.' "

Father, who lived with his parents, told DCFS that E.G. and L.G. said they did not want to be with Mother and wanted to come home with him because they felt safe with him.

As of February 2020, Mother had not visited the children. E.G. told the social worker, "We don't see [M]ommy." A.L. had no contact with Mother. Mother had telephoned L.G. once but then stopped calling.

DCFS recommended the juvenile court take jurisdiction over the children, remove them from their parents, deny Mother reunification services, and allow Mother monitored visitation with A.L. and E.G. DCFS recommended monitored visitation for Mother with L.G. when deemed appropriate by L.G.'s therapist.

IV.  Amended Dependency Petitions and Further Pre-Adjudication Reports

In February 2020, DCFS filed a first amended petition adding the allegation that the children came within the jurisdiction of the juvenile court pursuant to section 300, subdivision (i) (cruelty) based on Mother's failure to feed L.G. In April 2021, DCFS filed a second amended petition in which it

rephrased one of the failure to protect allegations, the cruelty allegation, and one of the abuse of sibling allegations to more thoroughly describe Mother's abuse of L.G. The children were again detained, and the jurisdictional hearing was set for August 24, 2020.

A.    *July 2020 Report*

L.G. and E.G. were placed with their paternal grandparents in March 2020. Mother was arrested in May 2020 and charged with torture and willful child endangerment. DCFS filed a supplemental report in July 2020 advising the court Father had asked to terminate the reunification process so his mother could adopt E.G. and L.G. The paternal grandparents were willing to adopt E.G. and L.G. The report did not document any visitation by Mother. DCFS continued to recommend no reunification services for Mother, monitored visitation for Mother with A.L. and E.G., and monitored visitation for Mother with L.G. when deemed appropriate by L.G.'s therapist.

B.    *August 2020 Last Minute Information*

In late August 2020, DCFS advised the juvenile court that A.L.'s caregiver was willing to monitor Mother's calls to A.L. and that Mother contacted A.L. twice per week. DCFS reported E.G. and L.G.'s paternal grandparents had agreed to monitor telephonic visits between Mother and E.G. The report did not state if Mother was contacting L.G., or if so, how frequently.

C.    *September 2020 Report*

The jurisdictional hearing was continued, and in September 2020 DCFS submitted a supplemental report describing its interview of Mother. Mother told DCFS, "I'm not

guilty. I do not starve my kids and I did not torture her." She said she spanked L.G. on the bottom with an open hand but did not leave bruises or marks. Mother denied taping L.G.'s legs, hands, or feet together, and she said she did not know why L.G. would believe she had been bound with tape. Mother claimed not to remember any injury to L.G.'s ear and said the marks on her legs and wrists happened when the dog caused her to fall on the stairs. She attributed the bruises on L.G.'s back to L.G. falling onto a bent fence on the side of the house. Mother had not taken L.G. to the doctor because she did not believe her injuries were serious. Instead, Mother cleaned them and applied adhesive bandages, but L.G. removed them and peeled her scabs.

Mother said L.G. did not consider Mother to be her mother, probably because she had been removed from Mother's custody at birth. When they reunified, L.G., then age three, told Mother she did not want to be with her. Mother said L.G. "didn't want to have nothing to do with me" and liked "being with anyone but me." L.G. cried and threw tantrums when she could not see her grandmother.

Mother said L.G. had always eaten quickly. She fed L.G. three times per day, with two snacks. Mother said, "She would wake up in the middle of the night and eat. She ate a lot. Maybe I should have taken her to the doctor because she did have an obsession with food. The way she ate it. She was always eating, like it was going to run away from her plate. But I never thought nothing of it because she was always skinny." Mother said E.G. was not a big eater and gave L.G. her leftovers.

The report did not mention Mother visiting or contacting the children. DCFS continued to recommend Mother be denied reunification services, allowed monitored visitation with A.L. and

E.G., and given monitored visitation with L.G. when L.G.'s therapist deemed it appropriate.

V.    Jurisdictional Hearings

The jurisdictional hearing began September 24, 2020. That day, the court directed DCFS to facilitate telephonic contact for Mother with E.G. and to provide Mother with a written telephonic visitation schedule. The hearing was then continued to November 2020.

In late October 2020, DCFS submitted a proposed visitation schedule to the court that would have allowed Mother two weekly telephonic visits with E.G. monitored by E.G.'s paternal grandmother. DCFS, however, recommended Mother not be allowed to contact the children because the court in Mother's criminal case had issued a protective order barring her from personal, electronic, telephonic, or written contact with the children until in May 2023.

The hearing was continued to December 2020 and then to February 2021. In the court's December 7, 2020 order, the court ordered DCFS to provide Mother with a written schedule for telephonic contact with E.G. that including holiday contact, subject to the protective order.

In early April 2021, after another continuance, DCFS submitted a last minute information advising the court that Mother claimed the caregivers were not regularly making E.G. available for telephonic visits. E.G.'s paternal grandmother denied Mother's claim. Mother, who was in custody, provided a telephone log from January 2021 to early March 2021 that indicated she had spoken with E.G. four times in that period. On seven occasions, Mother had been unable to call. On eight dates, the phone for E.G. was not answered. On six other dates, Mother

13

noted she did not speak with E.G., but she provided no explanation why. DCFS submitted a March 2021 written schedule that stated Mother was permitted to phone E.G. twice per week.

As of May 2021, Mother reported she "continues to experience issues concerning telephone contact with [E.G.] due to her fluctuating inmate schedule conflicting with the written visitation schedule . . . . The mother did state[,] however, that she has been able to maintain telephone contact with" A.L. E.G.'s caregivers stated they were willing to be flexible and adjust the written visitation schedule to accommodate Mother's changing schedule.

In May 2021, the juvenile court amended the second amended complaint by interlineation to (1) eliminate all allegations against Father and (2) remove A.L and E.G. from the allegations of cruelty and severe physical abuse of a child under the age of five (§ 300, subds. (e) and (i)), leaving those allegations in place only as to L.G. The court then found true as to all three children the allegations that Mother engaged in physical abuse, failure to protect, and abuse of a sibling (§ 300, subds. (a), (b)(1), & (j)). Additionally, for L.G., the court sustained the allegations of cruelty and severe physical abuse of a child under the age of five (§ 300, subds. (e) & (i).) The court declared the children dependents and set a dispositional hearing for June 10, 2021.

VI.   <u>Dispositional Hearing</u>

On June 10, 2021, at the dispositional hearing, counsel for each child joined in DCFS's recommendation that Mother be denied reunification services. Mother argued for reunification services with all the children, but especially with A.L. and E.G., whom she asserted were treated well and had "a close, positive

relationship" with her. Mother contended she had "tried to maintain a healthy relationship" with A.L. and E.G. and argued it would be detrimental to Mother to bypass reunification services.

E.G.'s counsel strongly opposed reunification services for Mother, noting that E.G. had witnessed Mother's torture of L.G. and had tried to feed L.G. when she was tied up for hours at a time. It was E.G.'s position that "there would be absolutely no benefit to" her from reunification services. E.G.'s counsel acknowledged Mother was trying to keep up a relationship with E.G. by phone, but "every time Mother calls from jail, [E.G.] doesn't want to pick up the phone. She doesn't want to speak to [Mother]." E.G. was "ready to move on." A.L. also did not want reunification services.

The court observed that while L.G. was the child who had been tortured, A.L. and E.G. were percipient witnesses who had tried to intercede to protect her, with limited success. They were put in the middle between the sibling they tried to save and the mother with whom they had "some degree of connection." The court said, "[T]hat connection became largely frayed because they were drawn into this and, in fact, quite conflicted," and noted that A.L. and E.G. had, at different times, both covered for Mother and admitted what she had done. The court gave weight to the children's desire to move on with their lives without trying to reunify with Mother, noting that A.L. was 15 years old and that E.G., "although younger, appears to have suffered through the ravages of what [L.G.] had experienced."

The court concluded DCFS had "more than adequately set forth by clear and convincing evidence the requisite elements" for bypassing reunification services. Mother was denied

15

reunification services with E.G. and A.L. pursuant to section 361.5, subdivision (b)(6), which provides that reunification services may be denied when the child is declared a dependent as a result of "the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent . . . , and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." Mother was denied reunification services with L.G. pursuant to section 361.5, subdivision (b)(5), which allows for bypass of reunification services to a parent when a child was brought within the jurisdiction of the court under subdivision (e) of section 300 because of the conduct of that parent.

A.L. wanted to maintain a relationship with Mother, so his counsel agreed with the case plan allowing monitored visits at Mother's place of incarceration. E.G.'s counsel opposed visitation with Mother, and particularly objected that in-person visitation would be "extremely detrimental" to E.G. Counsel said, "The focus now should be on what the permanent plan for [E.G.] should be. [¶] Additionally, Your Honor, the phone calls have been sporadic at best. At this point, as the court did point out, she was a percipient witness and she is trying to get over all of this. And the continued relationship with Mother by phone calls or visits or in-person visits is just going to hold back [E.G. from] going forward without some type of joint counseling or (inaudible) in a therapeutic setting[,] which is impossible at this point.

Mother asked for at least monitored phone calls with E.G., reminding the court that she had reported having "a phone conversation with [E.G.] last time." Mother argued that completely precluding in-person visits for E.G. would be detrimental because E.G. was still a child and sometimes did

16

want to talk with Mother. She argued E.G. might later want to resume in-person visits and asked for a written schedule of in-person visits so that she could visit in person if she chose.

The court orally ordered Mother would have "visits [with E.G.] in a therapeutic setting in person if recommended by the therapist consistent with the facility's protocol as well as virtual visits if recommended by the therapist in a therapeutic setting, the Department to help facilitate the visitation schedule consistent with the facility's protocol." This order was recorded in the minute order as an order of monitored visitation in a therapeutic setting.

The permanency planning hearing for E.G. and L.G. was set for October 6, 2021.

## VII. Travel Orders

In September 2021 the court authorized E.G. and L.G. to travel internationally with their paternal grandmother for one month (September 21, 2021 through October 21, 2021). DCFS advised the court the children would have telephone contact with their parents once or twice per week while they were away.

## VIII. Permanency Planning Hearing Report

DCFS submitted a report to the court containing a permanency planning assessment for eight-year-old E.G. and six-year-old L.G. DCFS advised the court that Mother "maintains regular monitored telephone contact with [E.G.] from her place of incarceration." All visits had been by telephone. The report did not provide information about the frequency or quality of the telephonic visits, or the nature of the relationship between Mother and E.G. Similarly, E.G.'s concurrent planning assessment stated Mother did not have in-person visits with her.

Although the form asked for the number of contacts or visits with Mother over the prior six months, the box was left blank.

DCFS recommended a permanent plan of termination of parental rights and adoption for E.G. and L.G. Adoption was "highly likely" because the paternal grandparents were "extremely motivated" to adopt, and they had completed all adoption assessments. The grandparents loved the children and the children were very fond of them. In August 2021 E.G. and L.G. told the social worker they were very happy with their grandparents and wanted to live with them "forever." They called their grandmother "Mami" and their grandfather "Papi." The children were observed to have a "healthy, positive attachment" to their grandparents and to be comfortable in their care.

VIX.  <u>Permanency Planning Hearing</u>

The permanency planning hearing for E.G. and L.G. pursuant took place on October 6, 2021. Mother was brought to court from her place of incarceration. She conferred with counsel and then elected not to be present for the hearing. Mother's counsel waived her appearance.

At the start of the hearing, the court stated it had conferred with counsel before calling the case and Mother's counsel had requested a contested hearing on the beneficial parental relationship exception to the termination of parental rights. Father declined to join Mother's request for a contested hearing, and he submitted on DCFS's recommendation. "And the Department's recommendation is to terminate parental rights for Mother and Father," said the court.

18

The attorneys for E.G., L.G., and DCFS all requested an offer of proof before a contested hearing was set. Counsel for DCFS reminded the court of the sustained allegations of severe physical abuse and cruelty and the protective order barring Mother from contacting L.G. She said E.G. "has had minimal telephonic contact with [Mother] at Mother's place of incarceration." Counsel argued "visitation is a major component for the [beneficial parental relationship] exception. Mother has not had any visits with her children."

Apparently referring to the unreported conference between the court and counsel before the case was called, counsel for DCFS noted that Mother's counsel had raised the "issue that the report did not address the [beneficial parental relationship] exception. I would argue it's Mother's burden to show that that exception applies, and the Department would not be able to have any facts to put in the report because Mother has not had any contact with either child. So I don't see why we would put this over for another report when the Department does not have any information to indicate that there is a bond."

The court asked Mother's counsel for an offer of proof. Mother's counsel did not make an offer of proof with respect to L.G., stating that Mother objected to the termination of parental rights but understood why the court would proceed. Mother's counsel continued, "Regarding [E.G.], I would just ask for a supplemental report to at least give or provide details or to interview the monitors of the monitored visitation that Mother is having with [E.G.]." Mother's counsel noted the permanency planning report merely stated Mother and E.G. had monitored telephone contact but included no details about the contact. Counsel observed that in "any other report that the court is given

19

there are always details regarding how those visits are occurring. So we would just ask to proceed on that, Your Honor. I don't know if I have any additional offer of proof."

The court said its tentative decision was to deny the request for a contested hearing because Mother's offer of proof was insufficient. It asked E.G.'s attorney to respond to Mother's contention she maintained "sufficient contact that it would be enough for Mother to be able to present [the beneficial parental relationship exception]."

E.G.'s counsel submitted on the tentative but noted that Mother's visitation with E.G. was supposed to be therapeutic and that had not occurred; there had only been "sporadic phone calls."

The court denied the request for a contested hearing, explaining, "I don't think that Mother has set forth the requisite showing for [the beneficial parental relationship] exception to apply. And, if I address it based on the information today, the finding would be that she has not maintained regular visitation. There are, in fact, impediments to that based on the previous orders limiting Mother's contact with the minors which gave rise . . . from the sustained petition that included [counts under section 300, subdivisions (e) and (i)]." The court continued, "The court finds that Mother has not maintained visits or established a sufficient bond under the [beneficial parental relationship] exception and any benefit from there would be far outweighed by the benefits of permanence and stability through adoption." The court terminated parental rights to E.G. and L.G. Mother's counsel asked the court to note her objection to the ruling. Mother appeals.

## DISCUSSION

I.    <u>Failure to Describe on the Record the Evidence Considered</u>

At the permanency planning hearing, the court is required to review the report prepared for the hearing, indicate it has read and considered it, and receive other evidence that the parties may present before making its findings and orders. (§ 366.26, subd. (b).) Here, at the hearing, the court erred by failing to declare it had received, read, and considered the report, in violation of section 366.26, subdivision (b).[2]

Mother acknowledges the order terminating parental rights may only be reversed if it is reasonably probable that a result more favorable to her would have been reached in the absence of this error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Mother argues the error was not harmless. On the premise that the court's failure to make a record that it had read and considered the report means the court did not read and consider it, she argues reversal is required because without the court formally receiving evidence, and without the court stating that it read and considered the report, no substantial evidence supports the court's ruling and it cannot be determined upon what facts the court based its order.

If Mother had been concerned about noncompliance with section 366.26, subdivision (b), she could have and should have raised the issue at the hearing, at which time the court could

---

[2]    The minute order from the hearing states that the court "has read, considered, and admits into evidence the social worker's report dated 9/16/2021 and any other information reviewed including the adoption assessment," but the court did not make this statement during the hearing.

easily have remedied the problem she now raises on appeal. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, footnote omitted, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) Mother forfeited this issue by failing to object on this ground in the juvenile court.

In any event, we are not persuaded reversal is required. The record from the hearing shows all parties and the court were aware of the report, its contents, and the fact that the report was being considered by the juvenile court at the hearing. At the start of the hearing, Father advised the court he did not seek a contested hearing and would submit on DCFS's recommendation. The court responded by stating DCFS's recommendation, which had been contained in its report. The court's statement indicates its familiarity with the report and its contents. During the hearing, counsel for Mother sought a supplemental report, and counsel for DCFS argued there was no additional information to put in another report. To decide whether to order a supplemental report and to rule on the request for a contested hearing, the court necessarily had to review the report in question. Later in the hearing, the court referred to "the information today," and since no additional evidence was presented at the hearing, we understand the court to have been referring to the information in the report prepared for the hearing. Given that the court and the parties clearly were familiar with, discussed, and relied upon the report, we reject Mother's argument that the court did not

properly read and consider it. We conclude it is not reasonably probable that a result more favorable to Mother would have been reached if the court had fulfilled its obligation to state on the record at the hearing that it had read and considered it.

## II.    Failure to Set a Contested Hearing

Mother asked for a contested permanency planning hearing. "[A] parent has a right to 'due process' at the hearing under section 366.26 which results in the actual termination of parental rights." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816.) However, "due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122 (*Tamika T.*).)

The court may request an offer of proof to identify contested issues so it can "determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses." (*Tamika T.*, *supra*, 97 Cal.App.4th at p. 1122.) "The offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued." (*Id.* at p. 1124.) "The offer of proof must consist of ' "testimony, writings, material objects, or other things presented to the senses." ' [Citation.] It may not consist of simply 'the *substance* of facts to be proved . . . , since *facts* do not constitute *evidence*.' [Citation.] The material in the offer of proof must be admissible, and it ' "must be *specific* in its indication of the purpose of the testimony, the name of the witness, and the content of the answer to be elicited." ' " (*In re A.G.* (2020) 58 Cal.App.5th 973, 1006–1007.) The court's ruling whether to grant a contested hearing is reviewed for abuse of discretion. (*Id.* at p. 1003.)

23

When the court requested an offer of proof, Mother's counsel said, "Regarding [E.G.], I would just ask for a supplemental report to at least give or provide details or to interview the monitors of the monitored visitation that Mother is having with [E.G.]." Mother's counsel noted the permanency planning report merely stated Mother and E.G. had monitored telephone contact and it included no details about that contact. Counsel observed in reports "there are always details regarding how those visits are occurring. So we would just ask to proceed on that, Your Honor. I don't know if I have any additional offer of proof." Mother's offer of proof was simply a request for a continuance so that an additional report could be prepared, without any representation of what that additional report would prove. She did not identify any witnesses, any actual evidence to be produced, or any facts that would be elicited at a contested hearing. Mother did not assert that she had any evidence to support the existence of an exception to adoption, nor did she claim a supplemental report would have contained facts supporting the beneficial parental relationship exception. Under these circumstances, we cannot say the court abused its discretion in denying Mother's request for a contested hearing.

III.    Permanency Planning Hearing

"A finding under subdivision (b) . . . of Section 361.5 that reunification services shall not be offered . . . shall constitute a sufficient basis for termination of parental rights." (§ 366.26, subd. (c)(1).) At a section 366.26 permanency planning hearing, the court determines by clear and convincing evidence whether the child is likely to be adopted. If the court so finds, the court is statutorily required to terminate parental rights unless there is a compelling reason to find that termination of parental rights

24

would be detrimental under one of the six exceptions enumerated in section 366.26, subdivision (c)(1)(B).  (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206–207).  One of the exceptions is the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i), which applies when a parent has maintained regular visitation and contact, has established a positive emotional bond with the child, and the child would benefit from continuing the relationship to such a degree that the child would be greatly harmed by termination.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)

Three elements must be satisfied to establish the beneficial parental relationship exception: 1) regular visitation and contact, taking into account the extent of visitation permitted; 2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Cade  C.*, *supra*, 11 Cal.5th at p. 636.)  When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights.  In that case the court must select a permanent plan other than adoption.  (*Id.* at pp. 636–637.)

The parent has the burden to show the statutory exception applies.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)  When a parent has presented evidence to support his or her claim that the exception applies, we review the juvenile court's findings using a hybrid approach: for the first two elements, which require factual findings (parental visitation and the child's emotional attachment), we apply the substantial evidence standard of

review; and for the court's weighing of the relative harms and benefits of terminating parental rights, we use the abuse of discretion standard. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–641.) However, when a party with the burden of proof did not carry that burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

When deciding whether to set a contested hearing, the juvenile court indicated its tentative intent to deny Mother's request because the court did not believe she had made a "sufficient showing that the contact [between Mother and E.G.] is of the nature and quality that would support" the parental benefit exception. Ultimately, the court ruled Mother had not set forth "the requisite showing for [the parental benefit] exception to apply."[3] The court was correct in concluding Mother had failed to

---

[3] Immediately after ruling that Mother had not made a sufficient showing that the beneficial relationship exception applied, the court, while making the findings preliminary to the termination of parental rights, also said Mother had not maintained visits or established a sufficient bond for the parental benefit exception and that any benefit conferred by E.G.'s relationship with Mother would be far outweighed by the benefits of adoption. This raises the question whether to interpret the court's ruling that the exception was not applicable as a determination that Mother had not carried her burden of proof or

26

meet her burden to prove the exception applied, because when Mother was given the opportunity to describe the evidence she would present at a contested hearing to establish the applicability of the exception, she was unable to do so. "A proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact." (*Tamika T., supra,* 97 Cal.App.4th at p. 1124.) Here, as we have concluded above, Mother had failed to demonstrate that there really was any contested issue of fact with respect to the beneficial parental relationship exception.

Because the court concluded Mother failed to carry her burden of proving the exception applied, we determine on appeal whether the evidence compels a finding in her favor as a matter of law. (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.) Mother has failed to show that the evidence below, taken as a whole, compelled a finding in her favor.

---

as the result of substantive factual findings and a weighing of the relative harms and benefits of terminating parental rights. While we acknowledge the ambiguity, we understand the ruling to be based on Mother's failure to carry her burden of proof because of its context: the court had just afforded Mother the opportunity to make a showing of the specific information she believed would prove the exception; Mother did not do so; and as a result, the court expressly stated she had not made a showing sufficient to warrant an evidentiary hearing. We find it implausible that the court would rule that Mother had not made a showing that would merit a contested evidentiary hearing, but then make the rulings that would be made after an evidentiary hearing.

A.    *Regular Visitation and Contact*

On the first element, regular visitation and contact, taking into account the extent of visitation permitted (*Caden C.*, *supra*, 11 Cal.5th at p. 636), there was scant evidence that Mother had maintained regular contact with E.G.  In December 2019, Mother was granted monitored visitation a minimum of three times per week for two hours per visit.  As of February 2020, Mother had not telephoned or visited E.G. at all.

Mother claims in her opening brief that she visited E.G. telephonically from May 2020 to October 2021 as jail conditions permitted.  None of the citations to the record provided by Mother states that she visited telephonically with E.G. during 2020.  No contact between Mother and E.G. was reported in the July 2020 report.  The possibility of telephonic visitation arose in the August 2020 report, in which DCFS informed the court that E.G's paternal grandparents had agreed to monitor telephone calls between Mother and E.G.  The report did not state that any calls with E.G. had yet taken place, in contrast to A.L., for whom DCFS reported not only that his caregiver had agreed to monitor calls but also that Mother and A.L. were now speaking twice weekly.

DCFS's report filed in September 2020 similarly did not mention any visitation by Mother.  In September 2020, the court ordered DCFS to facilitate calls with E.G. and to give Mother a written schedule for telephone visits.  In October 2020, DCFS advised the court that "[M]other's proposed telephone visitation is scheduled" for two days per week, and that E.G.'s grandmother "will serve" as the monitor.  (In contrast to the future tense used to describe the monitor selected for E.G.'s calls, DCFS advised the court in the present tense that A.L.'s caregiver "serves as the

28

monitor" for his calls with Mother.)  The report did not indicate that any calls between Mother and E.G. had yet occurred.

In December 2020, the court ordered Mother to be provided with a schedule for calls with E.G., but provided that visitation was subject to any active criminal protective order.

While the record does not pinpoint when Mother began telephoning E.G., the first telephone call between Mother and E.G. we are able to identify in the record took place in January 2021.  As of early 2021 Mother was scheduled for two calls per week with E.G., but she submitted a phone log in March 2021 showing she had spoken with E.G. only four times between January and March.  Although Mother alleged E.G. was not being made available for her calls, her log showed that the missed telephonic visits were caused by Mother being unable to call almost as many times as they were caused by no one answering the phone at E.G.'s residence (seven times Mother could not call versus eight dates with no answer).  Mother listed six other dates when she did not talk to E.G. but she offered no reason why.

As of May 2021 Mother said she was still having issues with calls to E.G. because of conflicts between her schedule and the written visitation schedule.  E.G.'s grandparents agreed to adjust the schedule to accommodate her.

In June 2021, E.G.'s counsel acknowledged Mother was trying to keep up a relationship with E.G. by phone, but E.G. did not want to speak with Mother when she called.  E.G.'s counsel described Mother's calls as "sporadic at best."

Mother's counsel told the court in June 2021 that Mother "did have a phone conversation with E.G." and E.G. was sometimes willing to speak with her.  The court ordered virtual

29

and in-person visits in a therapeutic setting if recommended by the therapist.

The children were traveling for a month starting in September 2021; arrangements for telephonic visits during that time were in place, but the record does not state whether Mother and E.G. had any contact.

At the October 2021 permanency planning hearing, counsel for DCFS and for E.G. described Mother's telephone calls with E.G. as "sporadic." There had been no in-person visits. The report for the permanency planning hearing stated, without elaboration, that Mother had maintained "regular monitored telephone contact" with E.G. The report did not define "regular" or describe the amount and nature of E.G.'s contact with Mother. The concurrent planning report left blank the box where the number of E.G.'s contacts with Mother in the prior six months should have been entered.

While Mother is correct that the assessment should have included a "review of the amount and nature of any contact between the child and the child's parents . . . since the time of placement" (§ 361.5, subd. (g)(1)(B)), here, information about the amount and nature of E.G.'s contact with Mother was fully and equally available to Mother. She could easily have provided evidence to the juvenile court about how often she and E.G. spoke on the phone. Instead, she declined to attend the hearing where she could have offered information about contact with E.G. to the court; and when making an offer of proof, her counsel asked for DCFS to prepare an additional report about visitation rather than identifying any evidence Mother had engaged in regular contact with E.G. Based on this record, we cannot say that as a matter of law the record compelled a finding that Mother had

30

engaged in regular visitation and contact, taking into account the extent of visits permitted. (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.)

### B.    *Emotional Attachment to Parent*

The second element of the parental benefit exception is "a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 636.) In determining whether a positive emotional relationship has formed, the focus is on the child's age and particular needs, the length of time the child has spent in parental custody, and the positive and negative effects of interactions between parent and child, as well as how the child speaks about, interacts with, or feels about his parents. (*Id.* at p. 632.)

The court found that Mother had not "established a sufficient bond" under the parental benefit exception. Here again, the record does not compel a finding as a matter of law that E.G. had a substantial, positive, emotional attachment to Mother. We are unable to identify anything in the record that suggests such an attachment. E.G. lived with Mother for approximately her first 20 months but was then removed from Mother's custody for nearly three years.[4] Mother reunified with

_____

[4]    We are dismayed by Mother's counsel's misstatements of the time E.G. was in and out of maternal custody. In her opening brief, Mother's counsel stated "Mother cared for E.G. until she was removed at age six years," "Mother took care of her child for almost six years," and E.G. "had lived with mother—except for a short time—from birth in 2013 to the fall of 2019." In fact, E.G. was out of Mother's custody for nearly half of her first six years of

E.G. in 2018, but in 2019 E.G. was again removed due to Mother's abuse of L.G. At the time of the permanency planning hearing in October 2021, E.G. was eight years old. She had been in Mother's custody for only three and one-half years of her life. E.G., as the juvenile court found, had suffered from witnessing the torture Mother inflicted on her younger sister. Mother's conduct was so extreme that the court found that it would not benefit E.G. to attempt reunification with Mother. E.G. did not want to speak with or visit Mother.

Mother faults the assessment for not including details about how Mother and E.G.'s visits went, but just as with the visitation element of the exception, if E.G. had a substantial, positive attachment to Mother, Mother could have presented evidence of that attachment in her offer of proof. Mother was well-situated to present evidence of her relationship with E.G., the nature and quality of their attachment, E.G.'s particular needs, and the effects on E.G. of their interactions. But Mother, despite having been transported from jail to court for the hearing, absented herself before it began. And just as with the first element of the beneficial parental relationship, when asked for an offer of proof, Mother's counsel did not identify any evidence

---

life: she was removed from Mother from March 2015 to February 2018. Mother's counsel also misstates the duration of E.G.'s removal prior to this case as two years, when in fact it was just under three years—a significant difference when discussing a six-year-old child. " 'It is the duty of an attorney' to 'employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.' (Bus. & Prof. Code, § 6068, subd. (d).)" (*In re S.C.* (2006) 138 Cal.App.4th 396, 419.)

Mother could present that would support a finding that E.G. had a substantial, positive attachment to her. The evidence does not compel a finding in Mother's favor on this element as a matter of law.

### C. *Detriment from Terminating the Parental Relationship*

If a parent establishes the first two elements of the beneficial parental relationship exception, the court then proceeds to determine whether terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C., supra,* 11 Cal.5th at p. 636.) As Mother failed to meet her burden with respect to the first two elements of the exception, the detriment analysis could not be performed. The juvenile court implicitly recognized this when it described this element with a counterfactual conditional phrase: the court found that if there were any benefit to E.G. from her relationship with Mother, it "*would be* far outweighed by the benefits of permanence and stability through adoption." (Italics added.) Accordingly, we conclude Mother has not demonstrated that the evidence compelled a finding in her favor on the parental benefit exception as a matter of law.

Finally, we note Mother claims the juvenile court "terminated [her] appellate rights by failing to ensure a report existed regarding the nature and quality of E.G.'s relationship," and the court was therefore "unable to apply the careful analysis required by *Caden C.*" Mother does not explain, nor can we conceive, how the juvenile court could possibly have terminated her appellate rights. To any extent Mother is arguing the court abused its discretion in proceeding with the section 366.26

33

hearing based on an incomplete assessment, she did not object on this basis below. Certainly, Mother's counsel observed reports "always" include "details regarding how those visits are occurring," and this one did not. But Mother asked only for a supplemental report; she did not object to proceeding with the hearing on the basis that the report submitted to the court was inadequate to satisfy the statutory requirements for an adoption assessment. (*In re Urayna L.* (1999) 75 Cal.App.4th 883, 886; *In re M.M.* (2022) 81 Cal.App.5th 61, 67–68, rev. granted Oct. 12, 2022, S276099.)

## DISPOSITION

The order terminating parental rights is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

GRIMES, J.

HARUTUNIAN, J.*

---

\* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.